Good morning, Your Honors. May it please the Court, my name is Dave Shagel, and I represent the Appellant and Plaintiff in this matter, SMS Services LLC, and its sole owner, Mr. Stephen Schindler. We're here because we thought we had a cut-and-dried broker malpractice case that arose because in the summer of 2009, my client's insurance broker, HUB International, and Susan Carroll recommended that the insured value of my client's business jet be reduced from $33 million to what amounted to what became $27 million. And in a rush, we believe, the evidence shows, in a rush to finish the renewal, HUB forgot to check the contractual requirements, which she had copies of, relating to insurance, and failed to notice that those contractual requirements, in fact, required $33 million in insurance. And everyone agrees that had those contracts been checked, the reduction wouldn't have been appropriate and wouldn't have been recommended. Was there a duty to do that? Absolutely, Your Honor, we think so, for several reasons. First of all, they agreed in writing to check the contracts. The service plan that they drafted, HUB, said, and I quote, it's on page 140 of the record, review contracts to assure adequacy of coverage in relation to exposures and contract requirements as needed. That's sort of the catchphrase in all of this, isn't it? As needed? It is. Your Honor, it is. And we suggest that the only reasonable reading of as needed is when the need arises. In other words, here, for example. Who decides? Well, I think the broker has to decide, particularly when they're the ones that create the need. Here, they were the ones who recommended the reduction, which created the need to look at the contracts to see if the reduction was appropriate. Just like if I buy a plant and the instructions say the plant needs to be watered as needed, I don't think it would be appropriate to me to let it sit and wither and die because no one comes along and tells me to water the plant, particularly if I put it out in the hot sun where I can reasonably expect that it will need some water. It's the same principle here. I'd also point out that if you look at the service plan in its entirety, they're always careful to distinguish situations where the broker is supposed to do something on their own when it's needed and situations where they're only supposed to act on requests. And in the latter case, they use words like as requested rather than as needed. So we think that if you look at this agreement in context, as needed clearly means it's the broker's job to figure out when the requirement is needed. And we'd also say this needs to be looked at in the context of the professional relationship between my client and the broker. We presented expert testimony that specialists in this narrow area of insurance always look and should look at contract requirements. In fact, their own witness admitted that 75% of all of the aircraft she insures have these contracts with insurance requirements. So we think in the context, it was part of her professional duties anyway. So the way you read these phrases, as needed, that's the broker's responsibility? Yes, when the need arises. As requested means the insured's responsibility? Yeah, I think it's fair enough to say if it said as requested, I think the broker could fairly say we don't have to do anything until we get a request. But if it says as needed, then I think it puts some responsibility on the broker to figure out when that is needed, and particularly in the case where the broker themselves create the need. The problem here is our people testified that they reasonably thought the broker was going to look at the contracts. This is not one of these situations where there's sort of this hypothetical, ethereal question of how much insurance limits to buy. Everyone admits that anyone who looked at these contracts, who took the trouble to dig them out, would immediately see that the insurance should not have been reduced.  I'm sorry, was the broker told that? I'm sorry, told what? To look at the contract. No, no one specifically asked her to look at the contracts in 2009. In fact, she was specifically asked to look at the contracts in 2008, and she did so. Looked at these very provisions, but she forgot the next year what they contained. But we suggest that, well, that was her job, and in fact our people didn't look at the contracts specifically because they'd hired a person to do it for them and were relying on that person. So just like if I hire someone to do my taxes, I don't necessarily need to say to the tax preparer I've hired, did you look at this section of the revenue code? Did you look at that set of deductions? I'm entitled to rely on their expertise to do what's appropriate, particularly whereas here they themselves have created the need. That's a good analogy for a lot of reasons, the way the tax code works in terms of you sign, you're responsible. So that may not be the best analogy here because you're basically saying as needed means it shifts the burden from your client to the broker, right? Well, as between us and the broker, but, Your Honor, we were responsible. My client had to pay. Well, I know, ultimately, but not as between you and the broker. I mean, your client has the contract, and your client knows what the contract says, right? Well, he was relying on the broker to remind him, but certainly had he pulled it out and read it, he would have been capable, as anyone would have, of figuring out what it required. That's right. So it's only a question of where the liability shifts to. Well, yeah. We would say, Your Honor, he had delegated the responsibility to read the contracts to the broker, and the broker failed in that responsibility. And so the only question really is on this contract issue is whether the term as needed put the onus on the broker. When she herself created the need, whether she could fairly sit and do nothing. And what is, in your view, what's the best question and case on that point? Well, we would say that there's three cases, probably. The AASDMP case, the Peterson v. Big Bend case, and the 1965 Washington Supreme Court case, the name of which is escaping me just one second. Liscombe? No, that's a court of appeals case. The Anderson-Feed v. Moore case. That's the last time the Washington Supreme Court actually addressed any of these issues with 1965 in the Anderson-Feed case. And, Your Honor, in all of those cases, in the Supreme Court cases certainly, the court really boiled it down to a very simple issue. They said if you're an insurance broker, you have a professional duty to your client. The scope of the duty is either created by the communications between them or it's defined by expert testimony about what a reasonable broker would do in those circumstances. And if the broker had a duty to do something, or if the broker took on that duty by making a promise and they failed in it, then there's a viable claim for professional malpractice on the part of the broker. Now, we suggest that things got sidetracked a little bit in some of these court of appeals decisions, Washington Court of Appeals decisions that all involve sort of a common factual scenario. And that scenario is someone buys personal insurance not from a broker but from an insurance company-appointed sales agent, has minimal contact with that agent, tells the agent, I want $50,000 in insurance or I want $100,000 in insurance. And then when there's a lawsuit, the insurance turns out to be inadequate because the person has more assets to protect, says, well, the agent, the company-appointed agent should have told me that I really ought to buy more insurance. And we suggest that for the reasons I've talked about, those cases are obviously factually distinguishable. But I'd also suggest it's the extent those cases say, or could be read to say, that in a situation like this, that a professional broker doesn't have a professional duty or responsibility that's enforceable in court to their client, that they don't accurately state Washington law. But we don't think that you even need to get there because, as I said, those cases do involve a situation that's very different from the one here. They involve no expert testimony regarding the scope of the insurance intermediary's duty of care. They don't involve what everyone agrees here is an obvious mistake. A lot of those cases are really more like proximate cause cases in which the question is, well, even had the broker or the agent recommended more insurance, it's not even clear that the insured would have purchased that. Here there's not a question about it. Everyone agrees, including Ms. Carol of Hub. She agrees that had anyone looked at the contracts, then they would have realized what a bad idea this reduction was. They would have realized it created this $6 million uninsured potential loss. I'd like to keep the remainder of my time for rebuttal. Thank you, Your Honor. Good morning. May it please the Court, my name is Steve Goldstein. I represent the defendant, Hub Insurance. I'd like to start by talking about the service plan because that is key, but I'm also going to talk about damages after that because the lower court did not address our alternate theory of relief, and it's important here because there were no damages, and the record is there for this court to review de novo. There is case law in Washington that when a specific promise is made by a broker, then that broker does have a duty to follow through on the promise. That's one of the exceptions to the general rule. The brokers just have a duty to act in good faith and follow directions. So how does your client define the phrase in the service plan, quote, as needed, close quote? It's defined to mean as, I think in the context of the service plan, which is an offer of services, it has to mean as requested. And this is because to understand how this service plan came about, I think is important. In 2008, they operated without a service plan, and NII, who was the agent of SMS, asked Sue from HUB to put together a plan of the services they offered. And it's called a service plan for that reason, and it offers many different types of services. Some on page two of the plan are to review different procedures. There's offers. Well, first of all, who agreed to review contracts to assure adequacy of coverage in relation to exposures and contract requirements? HUB agreed to do that. And then it says, comma, as needed. Yes. And your client's definition of as needed is as required. Or as requested. Because obviously you can't review a contract if it isn't provided to you. And the words as needed impose no duty whatsoever upon HUB. I think there has to be a request. Yes. Again, the service plan is a list. As needed means as the insured determines a need and then conveys that need to HUB. Yes. Is that correct so far? Yes. And then HUB decides whether what's being requested is called for, reasonable, needed, whatever? Then HUB reviews it within their expertise. And keep in mind there's no expertise needed to determine what the limits were. Even in 2008, the contracts weren't reviewed to see what limits were needed. Your opponent points out that elsewhere in the service plan, the phrase as requested is actually used. Is he right about that? There are some places where as requested is used. There are some places where it's not, where, again, it's obvious that it's. So what does as requested mean in other places in the service plan? It also means as requested. I think the reason that as needed has. I'm not trying to be a smart guy here, but from your client's point of view, as needed means as requested. And for the simple reason that you can't review something. I want to finish my question. Okay, I'm sorry. Your client's definition of as needed is as requested. And your client's definition of as requested is as requested. Yes. In the context of this service plan, it is one of the services offered. It sounds to me, correct me if I'm wrong, it sounds to me like that phrase means whatever your client wants it to mean. Well, I respectfully disagree. Tell me why I'm wrong. I think. Tell me why my impression is wrong. Because in this context, you can't review a document you don't have. The client has to say, I've got some contracts here. But we've been told that your client did have the previous version of that document. What the client was given in 2008 were drafts of some of these agreements. Did they include the insurance requirements? They did. So what is it your client didn't have? The client didn't know by 2009 whether any of the agreements were signed, whether they had been modified. Did your client ask any of those questions? The client did not ask any of those questions. So why should we assume your client was ignorant if it knew that there were drafts that contained insurance requirements? Because. Did it have the right to assume there were no requirements in the signed contracts? I'm sorry, Your Honor. Did it have the right to assume those provisions must have dropped out before the contracts were signed? No. I think what the client has to assume is that if they want the contracts reviewed in 2009 when they're renewed, they should say, here's the contracts that are applicable. Why were the drafts given to your client in the first place? To renew them in 2008? In 2008, it was not to determine the whole limit. The whole limit was told at the very inception of this whole process in May of 2008 to get $33 million in coverage. That was the direction to her. She was given drafts of contracts in part to find out who gets Certificates of Insurance. There were a number of dry lessees. They're each entitled to a Certificate of Insurance. The financer, Vessi, not only is entitled to a Certificate of Insurance, they were given three Certificates of Insurance when it was renewed in 2009. So she got $33 million initially? Yes, she was directed to. She recommended it be reduced. There's evidence, at least. There's a question of fact whether she recommended that it be reduced. What she did, she quoted, she gave them quotes at both $33 million and $27 million. The quotes included both, and that's very important here because it is the insured's choice which to take. And if that's not a reminder to the client, hey, you originally wanted $33 million. I'm giving you that quote again. This is your choice. Which do you want? And the e-mail exchange when Rebecca Cardwell communicated with Susan at HUB made it very clear that Sue was saying this is your choice. If it is your recommendation that the value has dropped to $27 million and that's the coverage you want, I will take that order. And she says in that e-mail exchange, which is very important, I accept your order for the $27 million. It almost sounds like, as you discuss this, that there's a factual issue. I mean, I realize we have these e-mails and we have this as needed, but it almost sounds like, as you discuss it, that there is a factual issue. Well, I don't think there is on that issue because, as Rebecca Cardwell testified, she did not ask her, she did not provide any contracts in 2009. She did not ask her to review contracts in 2009. And she just assumed that she would. And reviewing, again, as needed, I think the examples given just simply do not work. For example, watering plants as needed, then you're requested to water the plants. No, you told me to, if that's what I was supposed to do, but to review the contracts as needed, they would argue, well, it was certainly needed here because the contract actually told you the insurance floor. To me, that is a self, it's a 20-20 hindsight interpretation as needed. Then you can always go back after the fact. Isn't that what malpractice is always about? But not liability. Malpractice claims are always about that, but liability, the courts look at what the duty is to determine whether there's liability. And here it's a 20-20 interpretation of what as needed means. Anytime something goes wrong, then, hey, well, obviously it was needed. It may never have been requested. And, again, keep in mind the Vesey contract was never, ever given to HUB. In 2008, the day before the transaction closed, they emailed to them the definition of a stipulated loss value, which required a formula. The formula was never given. She was never told what the value was of the Vesey contract. And why was that? Because these people knew all along what type of coverage they wanted in 2008. They weren't relying on her expertise to read a contract to see that it said $33 million. These are sophisticated people. NII had a contract, a management contract. It would be in effect that 2008 is 2008. We draw the line, we go to 2009. Yes, it is. Everybody seems to have forgotten in 2009 what was known in 2008. Is that an issue? It sounds like that's an issue as to who's responsible for keeping that in mind or double-checking. And NII, in their management contract, had a specific requirement to SMS that they would get the insurance required. So they have a contractual agreement in writing specifically on the Hull limits. That is NII. So NII also has the service plan with your client. Correct. For which there's a proposed fee structure, 12.5%. What's the 12.5%? And what does that tell us? I mean, that suggests to me that there is some compensation being paid to your client. Your client receives some compensation for doing something. I'm adrift. We're told that there is expert testimony saying, in this context, this is something the insurance broker is supposed to do. Why doesn't that make this a question of fact? First of all, the expert is testifying on a question of duty, which should not be done. I mean, that's what the lower court held, and that's what I believe is the problem. I'm suggesting that, okay, it looks like from the service plan, which is pretty bare bones, so I'm trying to figure out what this stands for. There is something called a proposed fee structure, so apparently there's some kind of fee being paid. It's paid to commission, which is how brokers are always paid. And under the Washington law, there's no special relationship unless you paid a fee on top of the commission. 12.5% was a negotiated commission. With whom? Who's it negotiated with? It was negotiated with NII. Well, that suggests the relationships with NII, not simply with the insurance carrier. Yes. Is this something, the 12.5%, this is money out of NII's pocket? It's actually not. It's money out of the insurance company's pocket. See, that's why I can't, that's what has me confused, because usually, I understand commissions usually come from the premiums.  This is negotiated with the insured. Since when does the carrier pay whatever the insured negotiates to the agent? It's unusual. But I would like to turn my attention now to damages, because SMS had no damages, and this is really important to note. The money that was paid to Vesey was taken out of the security deposits. This was called a collateral, and all of the documents cited in our brief. Each of these dry lessees. Let me see if I understand your damages argument. Are you saying that even if the coverage had been written for $33 million, they wouldn't have recovered any more than the 27 because there wasn't value in the plane? That's one of the arguments. But the first argument is that SMS did not pay Vesey the $3 million. Steve Schindler paid it out of the collateral he was required to put up in the dry lease. The dry lease is very specific. We put up $3 million. Distinguishing them between Schindler and SMS, of which Schindler is the only. Correct, because Schindler actually had a contract with SMS, the dry lease agreement. The dry lease agreement required Schindler to put that money up as a guarantee for the performance of the sub-lease, the dry lease. One of the requirements of the dry lease was to get $33 million in coverage. Schindler didn't get that. That money was put in a fund, and the Vesey money was paid from that collateral fund. And that's the language that are used in the dry leases, and that's the language used in the letter to Vesey saying we authorize you, SMS authorizes you, to take this $3 million shortfall from the collateral fund that was put up by both Schindler and by another dry lessee named Bob Crowley. It's not like this argument isn't there wasn't a loss, but you're saying the loss wasn't entirely suffered by this plaintiff. It wasn't suffered by this plaintiff at all. I'm saying Steve Schindler is not a plaintiff here. SMS is. They're distinct entities. And Steve Schindler paid this loss under an agreement with SMS. You can't have it both ways. You can't have an agreement with an entity then claim, well, but it's all one and the same. I mean, this is basic corporate law. This is an entity that sued. It's not Steve Schindler that sued. And then the other argument on damages is the $27 million. We do not know what would have been paid had $33 million in coverage been obtained. There's simply no evidence. And the burden is on the plaintiff to prove these damages. And the cases cited by counsel in opposition to that stand for the proposition that the broker has a duty to prove an exclusion, but the plaintiff has a duty to prove what would have been paid under the policy. The only information in the entire file is a letter written by the manufacturer called DeSalt who wasn't able to inspect the plane. And all he said was, you know, it looks like it's about $27.5 million, assuming both wings were damaged. The point on damages, or the big point I got from their brief, is if you go that route, there's a factual issue. And what is your position on that? Because you're saying nobody knows exactly what would have been paid. Because it's their burden to say $33 million would be paid, and that's their argument. And there's no evidence of that, and discovery is closed. So it's not a factual issue. To be a factual issue, you have to have some evidence saying, for example, from the insurance company, we would have paid $33 million, or we would have paid $30 million. But what we don't know, because they had a right to repair the plane, we don't know what they would have actually paid. They could have repaired the plane if it was $27 million, or they could have, as their expert said, negotiated a settlement. And while that sounds factual, it's insufficient to go to the jury at this point because there's no – it's speculative. We don't know what they would have done. What they needed was an expert to say this is what we would have paid, or testimony from USAIG saying this is what we would have paid in this scenario. But nothing to that extent was done. Their argument is we automatically get $33 million because that's what the limit is. But that's like arguing, well, if I had $300,000 of coverage to my house and it burns down and there's only $250,000 of damages, I still get the $300,000, but the burden is on the broker who failed to get the $300,000 to prove otherwise. Thank you. Thank you. Your Honors, just a few points in rebuttal. And I'd like to start in reverse order and first talk about the damages issue. We believe that all of these things are factual issues. First of all, regarding the distinction between Mr. Schindler, the individual, and his one-member LLC, SMS Services LLC, I think probably in his deposition, which is what they're relying on, when he said, I suffered the loss, he probably meant his sole-member LLC, and he wasn't careful enough to distinguish between the two because, of course, they're indistinguishable. We'll be happy to clear that up at trial. The documents leave a very clear trail that the owner of the airplane, the sole-member LLC, was the one who suffered the loss. Mr. Schindler is the one who now has $6 million less in his bank account or in his sole-member LLC's bank account, which for most legal purposes are essentially the same than he did before. So those are factual issues that we'll be happy to clear up at trial, certainly not a basis to throw the claim out on summary judgment. Another argument that he makes is that your client was offered the opportunity to say, yes, I want $33 million. What's your response to that? Absolutely. The response is that the client specifically went to HUB for advice, and this was on August 25, 2009, the day before this renewal was going to be done. They wrote to HUB and said, what's your advice? Should we go with the $27 or should we go with the $33? And HUB said, my advice is go with the $33, excuse me, the $27. That's excerpt of Record 144. They specifically advised. Having created this problem in the first place, HUB was the one that created this lower value. So at that point in making the recommendation, HUB had said you can go with $27 million, which is closer to the appraised value of the aircraft, or you can go up to $33 million, as is required by your contracts. And if they had said that, they'd be okay? Absolutely. I think if they had laid out the options and given the insured accurate information and let the insured make the decision, that's all they're required to do. But where had $33 come from in the first place? $33 was the value of the aircraft at the time that it was new. And the reason it's important is it's the cost to replace this aircraft with a new aircraft. Now, I'm a person who only buys used cars, but I understand there are some people who buy only new cars or only new business jets. And in this case, the testimony is the owners, if this aircraft was destroyed, they didn't want a used one, they wanted a new one that they could control from the beginning. The fact that the owner wants a new one doesn't mean the insurance payer is going to cover a new one. Well, in this case, the insurer agreed to because they offered a quote for $33 million. No, I mean, that's different. Is it a replacement cost insurance? Well, essentially, that's what this became. No, that's a different question. Not essentially. You know, replacement cost insurance is a very specific thing dictated by the terms of the insurance policy. So my question is, is this policy replacement cost insurance? No, Your Honor, not in the context that you stated. But let me explain if I might. There is no such thing as replacement cost insurance in aviation. In aviation, the insurance is fixed value. So essentially, you can get the functional equivalent of replacement cost insurance by purchasing a fixed value that's equal to the cost to buy a new aircraft. Couldn't the insurers say we're going to fix the old aircraft? In some instances, they do. And once again, Your Honor, we believe that that's a fact issue. We're happy to go to trial. But if we take that argument, you know, your client knew what it paid for it. Yes. So the notion that it's fixed value, if it takes a $27 million policy, it knows it's not going to get more than $27 million, right? Yes. But it knows it paid $33 million. Yes. And it knows that the price of aircraft don't go down unless you buy a used aircraft. And if it wants a new aircraft. So that whole argument doesn't make any sense to me. For you to say, well, it's really fixed value. They knew what the fixed value was. So why did they take $27 million? Because, Your Honor, they were relying on HUD's advice. Mr. Schindler's advice is based on the value of the airplane. It's an aging airplane and so forth. Not based on a fixed value of, like, this is what you paid for it. So if you want to get that amount of money, you've got to pony up for a $33 million policy. But HUD's advice ignored the critical contract requirements. Now, you're jumping issues here because we're talking here about damages. And I'm as baffled as Judge McEwen with regard to the notion that your client thought that by reducing the amount of insurance, it still had insurance that would buy it a brand new airplane if something happened to the first one. That just doesn't connect. Because your client's got to understand that airplanes have not dropped, what is it, 12% or whatever of value. Airplanes didn't get cheaper in the meantime. And so if your client buys $27 million, it shouldn't be under the illusion that it gets a brand new airplane if the first one's damaged. I've taken you over time. You're entitled to answer. Thank you, Your Honor. I think you're right, and I agree completely, that if our clients had thought this through, they would have realized on their own that the reduction was a bad idea. The fact of the matter is they were relying on HUD. It's not just that it was a bad idea. I'm still on the damages issue. Your response appeared to be, well, our client thought it was going to get a brand new airplane. And I'm saying, well, that doesn't compute. So what do you have in the record that justifies a claim for more than $27 million? Because, Your Honor, if the insurance had been at $33 million, we had evidence in the record consisting of the declaration of our expert that when the cost to repair approaches 50% or more and approaches 75%, then aviation insurers in all or nearly all instances simply total the aircraft and pay the agreed insured value. That was evidence in the record. They're entitled to challenge that at trial. They pay the policy limits. Yes. I mean, I'll need to go back now and look at that. But I think that's the question because the whole reason for the reduction that HUD recommends is that, look, the insured value has gone over time. Nobody thought about going back to look at what the contractual obligations to the other parties were. Well, that suggests to me if the insured value has declined over time, that's all the insurance carrier is going to pay. What evidence is there to suggest they're going to pay more than the insured value and instead pay a policy limit if somebody overinsures the airplane? I'm sorry, Your Honor. I apologize. If that's the question. My question may not have been clear. So what evidence is there that the payment out from the insurer is going to be something more than $27 million? If that's the question, I think, Your Honor, it has an easy answer. And the answer is that these are agreed value policies. So let's say insurance had been procured for $33 million. The policy is very specific and it's in the record. It requires the insurer to pay $33 million on a total loss. It's not the kind of policy that you or I might get that only says the insurer will pay the stated value or the fair market value, whichever is less. It agrees to pay the stated value regardless of the fair market value of the aircraft. All right. Thank you. Thank you very much. The case just argued, SMS versus HUB, is submitted.
judges: Hawkins, McKeown, Clifton